BENSLEY, Trustee, *v.* NORTHWESTERN HORSE-NAIL Co. and others.[1]

*(Circuit Court, N. D. Illinois.* January 11, 1886.)

1. PATENTS FOR INVENTIONS—WHEN EMPLOYER MAY USE IMPROVEMENTS MADE
    BY EMPLOYE.
        The improvements covered by the second and fourth claims of letters pat-
    ent No. 162,789, of May 4, 1875, for machines for finishing horseshoe nails,
    were made while the inventors and patentees were in the employ of the de-
    fendant company, under agreements whereby said company acquired the right
    to use all improvements made by complainants, and applicable to its nail-
    finishing machines, and hence complainants cannot demand compensation
    for such use.

2. SAME—PREPONDERANCE OF EVIDENCE.
        Against the testimony of one of the complainants, that he had not agreed
    his employer might use his improvements, was opposed the testimony of two
    equally credible and disinterested witnesses, one of whom had made a writ-
    ten entry or memorandum of the agreement on an occasion when it was as-
    sented to by complainant. *Held,* that the preponderance of evidence was in
    favor of the employer.

3. SAME—PRESUMPTIONS FROM RELATIONS OF EMPLOYER AND EMPLOYE.
        Where the patented improvements were developed and perfected at the
    sole expense of an employer, by employes who received extra pay on account
    of their known ability as inventors, *held,* that these facts, standing alone,
    made a very strong case in favor of the right of the employer to use such im-
    provements without further compensation.

4. SAME—NOVELTY—INFRINGEMENT.
        Although this case is expressly decided on other grounds, the court had
    grave doubts whether Armstrong was the inventor of the three-part die cov-
    ered by the second claim of the patent, and whether the bow-spring shown
    in and covered by the fourth claim of the patent was infringed by the com-
    bined centering device and ejector used by the defendant.

In Equity.

*Offield & Towle,* for complainant.

*Coburn & Thacher,* for defendant.

BLODGETT, J.    This is a bill for an injunction and accounting for
an alleged infringement of patent No. 162,789, granted May 4, 1875,
for an "improvement in machines for finishing horseshoe nails." The
patent in question contains six claims; but only two of those claims,
the second and fourth, are in controversy in this case. These two
claims cover what is known in the patented machine as the "shear-
ing die," by which the nails are trimmed or pointed, and a spring
which operates between the cutting surfaces of the die to aid in eject-
ing the nail from the die after the shearing has been done. Several
defenses are interposed: (1) That the devices in question were in-
vented and put in use by the patentees, Armstrong and Hutchinson,
while they were in the employ of the defendant company, under a
contract that the company should have the benefit, not only of their
skill as mechanics, but of their abilities as improvers of the machinery
used by the defendant; (2) that the devices in question are not pat-
entable, for want of novelty; (3) that they had been in public use for

. Reported by Charles C. Linthicum, Esq., of the Chicago bar.

more than two years prior to the application for this patent; (4) that the defendants do not infringe.

The proofs show that, in the early art of making horseshoe nails by machinery, the head of the nail was shaped, and the shaft drawn out flat to about the required size and length; but the nail was afterwards finished—that is, straightened, pointed, and beveled—by hand, usually by the blacksmith who used them.    Later on, machines were devised for straightening, sharpening, and beveling by machinery. At the time Armstrong entered the defendant's employ, in July, 1873, the defendant was using finishing-machines which had been devised and patented by Harry A. Wills, and had employed Wills to supervise the running of these machines, and make further improvements upon them.    Wills' machines then in use contained a device for rolling—that is, straightening, shearing, and beveling—the nails in one combined mechanism.

The contention of the defendant as to the first defense is that in the month of July, 1873, the patentee Daniel Armstrong went into the defendant's employ, with the understanding that his time was to be devoted to assisting Wills in the running and operating of the finishing-machines which Wills had constructed, and were then in operation in defendant's factory; and also to the making of such improvements thereon as his ingenuity and inventive genius might conceive or suggest; that in consideration of the scope of his employment, and that the defendant was to have the benefit of whatever improvements he might make upon the defendant's machines, Armstrong was to be paid higher wages than were usually paid to men who were employed to do the work of supervising the mere running and operation of such machines; that a skilled mechanic, competent to merely superintend the running of such machines, could be employed for from $3 to $3.50 per day, while the wages of Armstrong, in consideration of the benefits to defendant of his inventive ability, were to be $4.50 per day. As to the patentee Hutchinson, it is contended that he had been for many years in the employ of the defendant company, prior to the date of the patent in question, in the capacity of foreman of the machine or repair shop, and that, about the time of Armstrong's employment, Hutchinson's wages were advanced from $4 to $5 per day, with the understanding that defendant should have the benefit of whatever improvements he should make upon their horseshoe-nail machinery.

The proof as to this portion of the defense rests mainly in parol, and consists—*First*, of the testimony of A. W. Kingsland, who was secretary and treasurer, and who seems to have been the general manager of the business of the defendant company at the time Armstrong was employed, and during the time he continued in the defendant's employ.    He testifies as follows:

"*Answer.* It was a few days prior to the sixteenth day of July, 1873, that Mr. Armstrong was in the office of the company, and I said to him that Wills' finishing-machines—we believed it to be correct in principle, but were de-

fective in their mechanical operation; that Wills had more than he could attend to in operating the machines and improving them, and I thought we would like to employ such a man as he was; that we wished a man to grind the dies and operate the machines, and to take hold with Mr. Wills, and aid him in improving and perfecting them. I believe Mr. Armstrong told me that he was then in the employ of Mr. Sturgis, of the concern now known as 'The Chicago Stamping Company,' and was getting three dollars and a half a day. I offered him four dollars per day. He replied that if he gave us the benefit of his inventive talent he thought he ought to have more pay. I inquired how much he thought he ought to have. He replied he thought he ought to have four dollars and a half per day. I answered: 'We will give you four dollars and a half per day, with the understanding that we are paying for your hands and your brains, and that any improvement that you make in horseshoe-nail finishing-machines, while in our employ, applicable to our machines, shall belong to the company.' To this he assented. Within a day or two after, Mr. Armstrong was again in the office, and Mr. G. L. Smalley, the then superintendent of the company, was also present, and I repeated to him, in Mr. Armstrong's presence, the agreement as above stated, to which Mr. Armstrong again assented."

Again, in answer to question 25, Mr. Kingsland says:

"I made no written memorandum at the time Mr. Armstrong was engaged. Along in the spring of 1874, some of the workmen about the factory advised me that Mr. Armstrong was getting up a new finishing-machine. As I presumed some of the improvements which he had made on our machines might be embodied in his new machine, I thought it would be well to remind him of the agreement between us, and see if we understood it alike. The second day of April, 1874, I was in the finishing-room of our factory. Said to Mr. Armstrong: 'I see you are putting some things on our machines which you claim to be your own invention. I suppose you remember the agreement between us. We have the right to use all such improvements, and they belong to us.' He replied: 'Certainly, you can use these improvements, or my entire plan, for finishing horse-nails.' Of this conversation I made a memorandum in writing, on the second day of April, 1874, within half an hour from the time the conversation took place."

Kingsland produced his memorandum book, in which, under date of April 2, 1874, is written:

"Armstrong gave A. W. K. [A. W. Kingsland] consent to alter pointing-machines to use his plan. Demanded no pay for same. Told Wills of this, same day.
        [Signed]                                    "A. W. KINGSLAND."

George L. Smalley, who was the superintendent of the defendant's factory at the time Mr. Armstrong was employed, testified as follows:

"Shortly before Mr. Armstrong's commencing work for the company, being in the office of the company, Mr. Kingsland and Mr. Armstrong being present, Mr. Kingsland called my attention, and stated to me, in the presence of Mr. Armstrong, that he had agreed with Mr. Armstrong to go to work for the company, and assist in running and improving the finishing nail-machines we were then using, and that he was to assist Mr. Wills in perfecting and improving those machines, and that the company should have the right to use all such improvements made and applied or applicable to those machines; in short, that we employed, and had the right to the use of the product of, his hands and his brains. He says: 'Mr. Armstrong, is that correct,' and Mr.

Armstrong said: 'Yes,' and I will commence work next week or on Monday.' And the price was to be four dollars and a half per day."

The testimony of Kingsland as to the terms and scope of Armstrong's employment is, to some extent, corroborated by the evidence of Wills, who stated that, about the time Armstrong entered the employ of the company, Kingsland informed him of the nature of the duties which he expected Armstrong to perform, and at one time, while Armstrong was in the employ of the defendant company, in discussing some improvements which Armstrong was making upon the Will's finishing-machines, Armstrong said : "We could put in the bow-spring, or anything else he [Armstrong] had on the machine." Wills also corroborates Kingsland's statement that he called Wills' attention to the conversation noted in Kingsland's memorandum book, the same day the entry was made.

As to the defendant's version of the terms of the contract with Hutchinson, the evidence rests wholly on the testimony of Smalley, the superintendent, who testifies:

"Sometime previous to the great fire of 1871, while the company's factory and shop were at the corner of Canal and Monroe streets,—the exact year I cannot state,—I employed him to work in our repair-shop as a machinist. Soon after that, he was given charge of our repair-shop as foreman, and continued so up to the time of his leaving the employment of the company, his wages having been advanced from time to time, until soon after the employment of Mr. Armstrong, at which time we were paying him the sum of four dollars per day. At that time he was engaged in superintending our repairs, and working upon improvements in our nail-machines. At that time he said to me one day that he thought, in view of the improvements that he had made and was making to our machines, he thought he ought to have an increase of wages. I asked him what wages he thought he ought to have, and he said that he thought he ought to have five dollars per day. I told him I thought that was a large increase, but I would think of it, and let him know soon. Either that day, or the day following, I said to him that in consideration of his giving the company his best services in the invention and construction of improvements for our nail machinery, that I would consent to give him five dollars per day, the company to have the right to use all such improvements as he had made or should make or could make, applicable to our machines, and he agreed thereto, and the increase of wages commenced at the beginning of the week following this agreement, and the company continued to pay him that price from that time until he left the employ of the company. *Question.* Did Mr. Hutchinson make some improvements to machines used by your company, besides finishing-machines, and, if so, did the company have the right to use those improvements on their machines without further pay to Mr. Hutchinson, and did they so use them without any demand from him for any pay additional to his wages? *Answer.* He did make some improvements upon our forging-machines, without demanding or claiming any other pay than his wages, and such improvements were used by the company."

On the part of the complainant, the testimony is met by a flat denial by Armstrong and Hutchison that they, or either of them, ever made such an agreement as is testified to by Kingsland and Smalley ; and the only question is as to where the preponderence of proof upon this branch of the case rests.

I have no difficulty in concluding, as to Armstrong, that the preponderance rests upon the side of the defendant, for these reasons: *First*, there is nothing in the record showing, or tending to show, that Kingsland or Smalley are any the less truthful or reliable or intelligent witnesses upon the subject-matter than Armstrong, and they certainly have no greater interest in the case than he has; and, as against Armstrong, we have the clear, unequivocal, explicit statement of two witnesses against his denial; and this explicit statement on the part of Kingsland is somewhat corroborated by the written entry made in his memorandum book, which would seem to entitle it to credence as against a mere naked denial, however positive, of Mr. Armstrong. The testimony in the case also shows that Armstrong was known to the defendant company, prior to his employment, as an inventor or improver upon horse-nail machines; that he had made certain improvements upon what was known as the Dodge forging-machine used by the defendant, on which he had obtained patents, and for which the defendant was paying him a royalty at that time. Armstrong, therefore, came into the employ of the defendant with a known reputation and character as an inventor of this class of machinery, and it is but natural to suppose that the manager of the defendant company, in stipulating for his employment, would have stipulated that it should include whatever inventions or improvements he might make upon their machinery; and we find that, immediately upon entering into the employment of the defendant, Armstrong was placed in charge of the Wills finishing-machines, acting under the supervision of Wills, and that very soon afterwards he made changes and alterations in some of the Wills machines, among which was the introduction of the three-part die and the bow-spring, covered by the second and fourth claims of the patent. These devices were undoubtedly put into the Wills machines as the result of consultations with Wills, and as improvements upon the Wills machines, because Wills, being the inventor of those machines, and having the general supervision of their working in defendant's factory, it is not probable that he would have consented to Armstrong's modifications without fully understanding those modifications, if not contributing something to them by his own suggestions. It is not natural to suppose that a man like Wills, who, from the character of machines he had devised, must have had inventive talent of a high order, would have stood passively by, while Armstrong was making these improvements upon his machines, and not contributed something to them by aiding in adapting, if he had nothing to do with originating, the new die and spring.

This shearing die and clearing spring were mere improvements upon devices before that time in use, and well known in this class of machines for accomplishing the same result. Shearing dies were old, and "pushers," or means for ejecting the nail from the die after it had been sheared, were old. All that Armstrong did was to sub-

stitute what he claimed was a new form of die in place of the dies before that time used, and a spring pusher for one that was moved by the power that worked the machine; and subsequently, when Armstrong and Hutchinson organized and developed the elaborate machine for finishing horseshoe nails covered by their patent, these two devices, which had been in use in the Wills machine, were carried into their large machine, and covered by the second and fourth claims of their patent. So that we have clearly a case of the development and perfecting, by practical experience and labor, of the elements of the two claims of the patent in controversy, at the sole expense of the defendant, and under such circumstances as, even if standing alone, would make a very strong case in favor of the right of the defendant to use them, and these facts go far to suggest and support the conclusion that Armstrong and Wills were working together in a common employment in putting these new dies and springs into the Wills machines, with the understanding that the defendant was to have the benefit of this improvement. It must be borne in mind that Armstrong was working upon the Wills machines, and that he was seeking to make them more effective for the performance of the work of the defendant; and it was not until the manager, Kingsland, learned that Armstrong and Hutchinson had devised a complete machine, differing in many respects from the Wills machine, upon which they contemplated obtaining a patent, that he called Armstrong's attention to their contract, of which he made the memorandum of April 2, 1874.

As to the scope of Hutchinson's employment, the proof stands upon the testimony of Smalley for the defense, and the denial of that testimony by Hutchinson. But I find much corroboration of the testimony of Smalley in the circumstances of the case: Hutchinson's employment by the company; the advance of his wages to the sum of five dollars per day at about the time Armstrong was employed; the fact that he had made no demands upon the company, and taken out no patents for improvements he had already made in the machinery of the defendant; and the further fact that, so far as is disclosed in this testimony, whatever may have been the part taken by Hutchinson in devising the general features and characteristics of the machine covered by their patents, he would seem to have taken little or no part in contriving or putting into operation the die and spring in controversy in this case which were first developed and perfected in the Wills machine. It seems to me more probable that Armstrong and Wills, both experienced inventors, especially in this class of machinery, devised these dies and springs in their experiments for improving Wills' machines; and when the large machine covered by the patent was conceived, this die and spring was carried into it, on the assumption that Armstrong had invented it.

For these reasons I feel impelled to the conclusion that the employment of Armstrong and Hutchinson by the defendant was such as to

preclude them from making any claims against the defendant for the devices now in controversy. It would seem, from the testimony in the case, that when Hutchinson and Armstrong had completed the drawing of their invention, and applied for their patent, they made a demand upon the defendant company for royalties for the use of their machines, and in the discussion growing out of this demand the defendant company asserted, not only a right to use the machines, but the ownership of the patent. The controversy in this case, however, necessarily involves only the question of the right of the complainants to demand compensation of the defendant for the use of this patent, and does not involve the ownership of the patent as between the defendant and the complainants.

Taking this view of the first point made by the defense, it is, of course, unnecessary to consider the questions of novelty, prior use, and infringement; but I may, I think, with entire propriety, say that, upon the testimony, there is room at least for grave doubt whether Armstrong was the inventor of the three-part die covered by the second claim of the patent, and whether the bow-spring shown in and covered by the fourth claim of the patent is infringed by the combined centering device and ejector used by the defendant. The bow-spring shown in the patent operates only as an ejector. Wills' pusher performed the same function, and the bow-spring only differed from it in working by its own elasticity instead of from the power that drove the machine. But I wish it understood that I do not decide the case on this point, but upon the proof of defendant's right to use these features of the patent under the agreement set up.

The finding will be that the defendant has the right to use the second and fourth claims of complainants' patent.